## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| HPIL HOLDING,<br><br>                                Plaintiff,<br><br>    v.<br><br>POWER UP LENDING GROUP., LTD.,<br>ASHER ENTERPRISES INC.,<br>GENEVA ROTH REMARK HOLDINGS,<br>INC.,<br>HOPE CAPITAL, INC.,<br>KBM WORLDWIDE INC.,<br>REDSTART HOLDINGS CORP.,<br>SIXTH STREET LENDING, LLC,<br>VIS VIRES GROUP, INC.,<br>CURT KRAMER, and<br>SETH KRAMER,<br><br>                                Defendants. | **CIVIL ACTION NO. _____**<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff HPIL Holding, through counsel, states for its Complaint against Defendants

Power Up Lending Group, Ltd., Asher Enterprises Inc., Geneva Roth Remark Holdings, Inc., Hope

Capital, Inc., KBM Worldwide, Inc., Redstart Holdings Corp., Sixth Street Lending, LLC, Vis

Vires Group, Inc., Curt Kramer, and Seth Kramer[1] as follows.

---

[1]    The following terms are used herein: Plaintiff HPIL Holding ("HPIL" or "Plaintiff"); Defendant Power Up Lending Group, Ltd. ("Power Up"); Defendant Asher Enterprises Inc. ("Asher"); Defendant Geneva Roth Remark Holdings, Inc. ("Geneva Roth"); Defendant Hope Capital, Inc. ("Hope Capital" or "Hope"); Defendant KBM Worldwide, Inc. ("KBM");  Defendant Redstart Holdings Corp. ("Redstart"); Sixth Street Lending, LLC ("Sixth Street"); Defendant Vis Vires Group, Inc. ("Vis Vires"); Power Up, Vis Vires, KBM, Asher, Redstart, Geneva Roth, Hope, and Sixth Street (each individually, a "Lending Entity", and, all, collectively, the "Power Up Enterprise"); Curt Kramer and Seth Kramer (collectively, the "Power Up Managers"); and, collectively, all Defendants ("Defendants").

## NATURE OF THE ACTION

1.      Power Up is a "death spiral" or "toxic" lender:[2] an unregistered securities dealer that engages in convertible market adjustable securities transactions with small public companies—businesses that are often struggling to raise capital.  Toxic lenders like Power Up are not the saviors of microcaps that they purport to be, nor is their business model legal:  as reflected in recent Securities and Exchange Commission ("SEC") prosecutions,[3] lenders like Power Up avoid registering so they can evade regulatory oversight and thereby make predatory loans that generate outrageous profits.

2.      The toxic lending business model is simple:  unlike an investor or day trader, the lender uses the loan transaction to acquire the company's stock at a steep discount[4] (on top of the formal loan interest), which it then dumps into the public markets as soon as possible, invariably causing a catastrophic plunge in the stock price.

3.      Power Up's business model is illegal. In recent civil actions, the SEC has prosecuted toxic lenders that use Power Up's precise business model for unlawfully operating as unregistered securities dealers in violation of § 15(a) of the Securities Exchange Act of 1934 (the "Act") (15 U.S.C. § 78o).  Every court to address this issue has agreed with the SEC.[5]

---

[2]     *See*      https://www.investor.gov/introduction-investing/investing-basics/glossary/convertible-securities      (last accessed April 13, 2022); https://en.wikipedia.org/wiki/Death_spiral_financing (last accessed April 13, 2022).

[3]     *See, e.g., SEC v. Almagarby*, 479 F. Supp. 3d 1266 (S.D. Fla. 2020); *SEC v. Keener*, 2022 U.S. Dist. LEXIS 11692, (S.D. Fla. 2022); *SEC v. Fierro*, 2020 U.S. Dist. LEXIS 238936 (D.N.J. 2020).

[4]     The stock is generally obtained via one or more market-adjustable convertible debt products required by the lender for making the loan; this may be the convertible promissory note itself or a warrant.

[5]     *See, e.g., Almagarby, supra; Keener, supra; Fierro, supra; SEC v. Big Apple Consulting USA, Inc.*, 783 F.3d 786 (11th Cir. 2015); *SEC v. River N. Equity LLC*, 415 F. Supp. 3d 853 (N.D. Ill. 2019); *SEC v. Fife*, 2021 U.S. Dist. LEXIS 242126, 2021 WL 5998525 (N.D. Ill. 2021) (the "SEC cases").  For private civil actions seeking rescission based on failure to register, *see Edgepoint Capital Holdings, LLC v. Apothecare Pharmacy*, 6 F.4th 50 (1st Cir. 2021), and *Auctus Fund, LLC v. Players Network, Inc.*, Case No. 20-cv-10766 (D. Mass. Dec. 10, 2021) (https://bit.ly/3OjfvR4) (last accessed April 13, 2022).

4.    The Agreements[6] in this case are patently unlawful, as they were made and subsequently performed in violation of § 15(a).  Accordingly, among other relief, Plaintiff seeks an Order:  rescinding the Agreements and finding them to be void pursuant to the Act; requiring Defendants to return to HPIL every share of stock acquired under the Agreements, less the cash value of the net sum provided to HPIL for the purchase of the notes, and directing Defendants to pay recessionary damages.

5.    Further, the Power Up Enterprise is an association-in-fact "enterprise" under the Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. § 1962, *et seq.,* which has engaged in the collection of unlawful debts at the direction and control of the Power Up Managers for the purpose obtaining the stock of the micro-cap companies to which it lends.

6.    The loans created pursuant to the Agreements (the "Loans") are criminally usurious because they created charges in excess of the maximum enforceable rate of interest—25% per annum—allowed by New York state law.  *See* N.Y. Penal Law § 190.40.

7.    The total interest rate of the Loans, including the value of the market-adjustable conversion discount, is 97% on the February 2017 Note, and 140% on the August 2017 and October 2017 Notes.  The maximum rate of interest that may be charged in New York is 25% APR.  N.Y. Penal Law § 190.40.

---

[6]  "Agreements" are defined as the documents executed by Plaintiff in favor of Power Up, including securities purchase agreements (the "SPAs") and notes (the "Notes").  Specifically: **(1)** on February 17, 2017, HPIL and Power Up entered into a Convertible Promissory Note ("February 2017 Note"), under which Power Up purchased from HPIL a note in the amount of $33,000.00 bearing a 12% stated interest rate, and a Securities Purchase Agreement ("February 2017 SPA"); **(2)** on August 11, 2017, HPIL and Power Up entered into a Convertible Promissory Note ("August 2017 Note"), under which Power Up purchased from HPIL a note in the amount of $45,000.00 bearing a 12% stated interest rate and a Securities Purchase Agreement ("August 2017 SPA"); and **(3)** on October 18, 2017, HPIL and Power Up entered into a Convertible Promissory Note ("October 2017 Note"), under which Power Up purchased from HPIL a note in the amount of $35,000.00 bearing a 12% stated interest rate and a Securities Purchase Agreement ("October 2017 SPA").  A true and correct copy of each of the Notes and SPAs are attached as follows, with the exception of the February 2017 SPA and the October 2017 SPA, which Plaintiff does not have in its possession: (1) February 2017 Note as **Exhibit 1;** (2) August 2017 Note and August 2017 SPA as **Exhibit 2**; and (3) July 2017 Note as **Exhibit 3**.

8.      Accordingly, Plaintiff seeks treble damages under RICO because the amount of interest charged by Power Up is more than double the maximum enforceable rate allowed by law, as well as attorney's fees, and any and all other relief that the Court deems just, proper, and in the interest of justice.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 because Plaintiff is asserting a claim under the Act.

10.      This Court has diversity jurisdiction over this case pursuant to 28 U.S.C. § 1332(a)(2) because Plaintiff is a citizen of a foreign state and Defendants are citizens of New York, and the amount in controversy exceeds $75,000.00.

11.      The Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

12.      Plaintiff is a citizen of a foreign state of Canada pursuant to 28 U.S.C. § 1603(a).

13.      Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) and (2) because the Defendants' principal place of business is located in this District and because a substantial part of the events giving rise to this action occurred in this District.

## PARTIES

14.      Plaintiff is a citizen of Vancouver, Canada and is headquartered at 650 West Georgia Street, Suite #1720, Vancouver, V6B 4N8, Canada.  Plaintiff is currently incorporated in Wyoming as of 2019.

15.      Upon information and belief, each of the following six Lending Entities maintains its principal place of business at 111 Great Neck Road, Suite 214, Great Neck, NY 11021:

a.      Power Up;

  b.  Asher;

  c.  Geneva Roth;

  d.  Hope;

  e.  KBM; and

  f.  Vis Vires.

16. Redstart maintains its principal place of business at 1188 Willis Avenue, Albertson, NY 11507.

17. Upon information and belief, Sixth Street maintains its principal place of business at 1800 Diagonal Road, Suite 623, Alexandria, VA  22314.

18. Upon information and belief, six of the eight Lending Entities are incorporated in New York and two – Power Up and Sixth Street – are incorporated in Virginia.

19. Defendant Curt Kramer is a permanent resident of New York.

20. Upon information and belief, Defendant Seth Kramer is a permanent resident of New York.

## GOVERNING LAW[7]

21. The governing law in this case is that of New York,[8] notwithstanding provisions of the Agreements that specify Virginia law.[9]

22. Defendants may not avoid New York's usury laws based on a few – if any – *de minimis* connections to Virginia consisting of Power Up and Sixth Street being incorporated there,

---

[7] This section is not exhaustive of the reasons that New York law must be applied to this case.
[8] *See, e.g., Power Up Lending Grp., Ltd. v. Cardinal Energy Grp., Inc.*, Case No. 2019 U.S. Dist. LEXIS 57527, at *8-11 (E.D.N.Y. 2019) (rejecting contractual choice-of-law provision designating Virginia because that state "has no substantial relationship to the parties and New York would seem to have a materially greater interest in the application of its law").
[9] *See* February 2017 Note at Section 4.6, P. 11; August 2017 Note at Section 4.6, P. 11; August SPA at Section 8a, P. 10; and October 2017 Note at Section 4.6, P. 11.

while the remaining Lending Entities are incorporated in New York and the individual Defendants apparently reside in New York.

23.     The application of Virginia law to this case would violate a fundamental public policy of New York reflected in usury laws spanning more than 300 years.[10]

24.     Virginia does not have a reasonable relationship to the Agreements because, among other things:

a.     Upon information and belief, the parties negotiated and executed the Agreements from their New York offices, including but not limited to:

i.     by communicating with Plaintiff during the negotiations by phone and email; and

ii.    by exchanging drafts of the Agreements, and by sending and accepting the executed Agreements with Plaintiff via email.

b.     Upon information and belief, performance under the Agreement occurred in New York, including but not limited to:

i.     by communicating with Plaintiff by phone and email; and

ii.    by wiring the money to make the Loans from Defendants' bank located in New York.

c.     Six of the eight Lending Entities are incorporated in New York.

d.     All eight Lending Entities maintain principal places of business in New York.

---

[10]   *See Adar Bays, LLC v. GeneSYS ID, Inc.,* 179 N.E.3d 612, 616-21 (N.Y. 2021) ("[t]o understand New York's current usury laws, it is important to examine their history. New York's prohibitions on usury extend back to at least 1717…"); *American Equities Group, Inc. v. Ahava Dairy Products Corp.,* 2004 U.S. Dist. LEXIS 6970, 2004 WL 870260, at *8 (S.D.N.Y. Apr. 23, 2004).

## FACTUAL ALLEGATIONS

**I.    THE POWER UP ENTERPRISE**

25.    The Power Up Enterprise is an ongoing association-in-fact consisting of Power Up, Asher, Geneva Roth, Hope, KBM, Vis Vires, Redstart, and Sixth Street, with apparent relationships among the Defendants as depicted in **Figure A,** below.



26.    The Power Up Enterprise makes loans – including the Loans in this case – for the purpose of obtaining the stock of the micro-cap companies to which it lends.

27.    Upon information and belief, the Power Up Enterprise has made loans to other issuers that violate New York's usury laws and RICO in the same manner as the Loans.

**II.    THE POWER UP GENERAL BUSINESS MODEL**

*The Defendants Target Financially-*
*Strapped Issuers in Need of Capital*

28.    Upon information and belief, Defendants position themselves to take advantage of issuers' vulnerable financial conditions to negotiate highly favorable terms.

29.    Upon information and belief, Defendants obtain all of the stock directly from the

issuers through note conversions, as opposed to purchasing it in the open market (*i.e.,* like a "trader"). Because the shares that Defendants obtain are newly-issued, their subsequent dumping of the shares in the market significantly increases both the amount of shares in the hands of the public and the issuers' outstanding share totals. Selling into the public market large quantities of newly-issued shares acquired directly from issuers is a common hallmark of a securities dealer.

30.     In addition to reaping gains from the spread between the discount and the market price, upon information and belief, the Defendants negotiate added consideration such as up-front stock, stock purchase warrants, and compensation for fees and costs.

### The Defendants Convert Promissory Note Debt Into Newly-Issued Shares of Common Stock at a Substantial Discount

31.     The Defendants' business model exploits the tacking provision of SEC Rule 144[11] by holding only the promissory notes (which are payable absolutely and carry no investment risk) for six months. Upon conversion of the notes into stock, Defendants do not assume any economic risks of stock ownership—they immediately sell the stock to reap the spread between the discount and the market price.

32.     The value of the conversion discount at the time of entering into these transactions is a component of interest under New York state law that must be considered when calculating the true interest rate for usury purposes.[12]

33.     Upon information and belief, Defendants time their conversions and sales in an

---

[11]  SEC Rule 144, was adopted to establish criteria for determining whether a person was engaged in the distribution of securities. One condition under Rule 144 is that the selling security holder must have held the security for a specified period of time (six months in this case) prior to resale into the market. This condition helps ensure that the holder who claims an exemption has assumed the full economic risks of ownership and, therefore, is not acting as an underwriter. Rule 144 also permits "tacking" of the six-month holding period; if a security holder simply exchanges a previously-purchased security for a different security of the same issuer (such as with conversion), the newly-acquired security is deemed to have the same purchase date as the original security. If the holding period has expired, the new security may be sold immediately.

[12]  *See Adar Bays, supra,* at 621-27.

effort to comply with the holding period under Rule 144.  For that reason, Defendants generally wait either six months (the minimum Rule 144 holding period for securities issued by SEC-reporting companies) or one year (the minimum Rule 144 holding period for securities issued by non-SEC-reporting companies) after purchasing a convertible note, before they begin to convert the note into newly-issued stock and then sell that stock into the public market.

34.     The convertible notes that Defendants buy and/or solicit from the issuers have allowed them to acquire no fewer than one billion shares of newly-issued stock at a substantial discount—typically 25-50 percent below the lowest trading price for the issuer's common stock during the "valuation period" of 20 trading days preceding the date of the conversion request.

35.     Upon information and belief, after holding the convertible debt acquired in a convertible note deal for the applicable holding period contained in Rule 144, Defendants send conversion notices to the issuers and their transfer agents, identifying the amount to be converted and the corresponding shares to be issued to Defendants.

36.     Upon information and belief, instead of converting all of the debt into stock all at once, Defendants usually send multiple conversion notices for each convertible note.  Upon information and belief, among other reasons, Defendants incrementally converted debt into stock and sold said stock over a period of time to purposefully avoid owning more than five percent of any class of an issuer's publicly traded stock at any one time.  Far from an investment strategy, such incremental conversions and sales were timed for the purpose of evading the requirement to file a "beneficial ownership report" with the SEC (*i.e.*, Schedule 13D and Schedule 13G).  *See* 17 C.F.R. § 240.13d-1.

37.     Upon information and belief, Defendants arrange for the converted stock to be transferred to their brokerage accounts as quickly as possible to ensure maximum profits and to

capitalize on the conversion discount, often paying expediting fees to further reduce the time.

38.     Upon information and belief, as part of their business model, Defendants obtain incorrect attorney opinion letters to assure brokerage firms that the converted stock is not restricted and may be resold to the public.

### Defendants Sell the Converted
### Stock Into the Public Market

39.     Upon information and belief, once the Defendants' brokers deposited the newly-issued, converted shares of issuer common stock into their brokerage accounts, Defendants generally begin selling the shares into the public marketplace immediately to lock in their profits.

40.     Upon information and belief, Defendants personally, or through an affiliated person, entity, or independent contractor acting at their direction, use the telephone and the internet to place sell orders.  Sales are made through brokers.

41.     Upon information and belief, however, Defendants have generally sold only as much as the market will bear, often staggering their sales over a short period of time instead of all at once.

42.     Upon information and belief, Defendants' practice is to sell the shares they have acquired in a conversion continuously on a daily or near-daily basis until they have sold *all* of their shares into the market.

### Defendants Earn Significant Profits From
### Selling Discounted Shares of Stock

43.     Upon information and belief, Defendants reap large profits from their unregistered dealer activity, the majority of which result from reaping the difference between the market prices they receive when they sold the stock to the public, and the deeply-discounted prices at which they acquire shares from the issuers, rather than from any appreciation in the stock's price.  This

mechanism gives Defendants a spread or markup on the stock that they sell; it is a common practice of a securities dealer.

44.     As of 2008, the Defendants have performed *at least 1,210 securities transactions and have entered into securities transactions (convertible notes) with at least 239 various issuers* and have converted those notes into no fewer than one billion shares of newly-issued stock that the Defendants subsequently sold on the secondary market for tens of millions of dollars.[13]

45.     Upon information and belief, Defendants have generated tens of millions of dollars in gross stock sale proceeds, with many other securities transactions still outstanding.  The majority of the net profits come from the spread between Defendants' discounted purchase price (per the terms of the applicable note) and prevailing market pricing.

### *Defendants Violate the Federal Securities Laws by Acting as Unregistered Dealers*

46.     At all relevant times herein none of the Defendants was registered as a securities dealer with the SEC or an acceptable Self-Regulatory Organization, such as FINRA.

47.     Defendant Curt Kramer was registered as a broker with the Financial Industry Regulatory Authority, Inc. ("FINRA") between January 1998 and July 2002.  His license as a broker was terminated in July 2002.

48.     Each time Power Up purchases a convertible note, converts debt into stock, or sells conversion stock, it effects a transaction in securities.

49.     As part of its regular business, Power Up acquires large volumes of shares directly

---

[13]  Based on the EDGAR search engine that is available to the public, Defendants have engaged in the following volumes of securities transactions with various issuers:
1.   Power Up has entered into at least 934 securities transactions with at least 148 issuers.
2.   Vis Vires has entered into at least 156 securities transactions with at least 67 issuers.
3.   Redstart Holdings has entered into at least 2 securities transactions with at least one issuer.
4.   Geneva Roth has entered into at least 49 securities transactions with at least 13 issuers.
5.   Asher has entered into at least 5 securities transactions with at least one issuer.
6.   Hope has entered into at least 64 securities transactions with at least 9 issuers.

from issuers at a substantial discount to market, sells large volumes of shares back into the open market for a substantial profit due to the conversion discount, and does so for its own account absent investment intent.   Accordingly, Power Up purchases securities, voluntarily converts securities, and sells securities as part of its regular business for its own account.

50.    Upon information and belief, Power Up has purchased similar convertible securities on numerous occasions with various microcap companies in addition to HPIL.

51.    Upon information and belief, Power Up makes use of the mails, email, the internet, and other instrumentalities of interstate commerce to effect its agreements and subsequent securities transactions.   For example, Power Up transfers cash through wire transfers, and uses email and telephone communications to negotiate and effect purchases and sales.

52.    Any person engaged in the business of buying and selling securities for such person's own account (through a broker or otherwise) as part of a regular business must register as a dealer with the SEC, or, in the case of a natural person, associate with a registered dealer. *See* 15 U.S.C. § 78o(a)(1).

53.    By failing to comply with the dealer registration requirements mandated by federal law, Power Up purposefully "operates under the radar" to avoid important legal and regulatory oversight by the SEC and FINRA.

54.    The dealer registration requirements provide important safeguards for the investing public, shareholders, and companies.   The excessive compensation and patently unfair terms used in the Agreements (and in Power Up's transactions with other issuers) would have violated FINRA Rules 5110(b) and 5110(c)(2)(A), and thus could not be effected by a registered securities dealer.

55.    Power Up's outrageous profits from the Agreements resulted from the difference between (a) the heightened market prices at which it sold the newly-acquired shares into the public

market, and (b) the discounted price at which it purchased or acquired the stock from HPIL.  This mechanism – through which Power Up reaps the profits on the spread or markup of the stock that it sold – is a common practice of a securities dealer or underwriter.

56.     Registration as a securities dealer and accompanying SEC oversight would further prevent Power Up from utilizing the Rule 144 tacking provision (17 C.F.R. § 230.144(d)(3)(ii)) because Power Up acquires securities with a view to distribute the same, which constitutes underwriting activity.  Operating as an underwriter requires dealer registration.

57.     As a part of its regular business, Power Up obtains newly-issued stock directly from microcap issuers through note conversions, as opposed to purchases in the open or secondary markets.

58.     The convertible securities that Power Up purchases enable it to acquire billions of shares of newly-issued stock at a significant discount – typically 25-50 percent of the trading price.

59.     As a regular part of its business, Power Up sells large blocks of newly-issued shares into the public market, a common hallmark of a securities dealer.

60.     Upon information and belief, Power Up has used the same business model to extract millions of shares of stock from Plaintiff and other unwitting issuers

III.    **DEFENDANTS' BUSINESS MODEL AS APPLIED TO PLAINTIFF**

*Defendants Entered Into the*
*Agreements, Which are Usurious and*
*Unenforceable Under New York Law*

61.     As demonstrated by the Agreements, and the additional transactions with other issuers alleged above – which are a part of Power Up's regular business – the Defendants are engaged in the business of collecting unlawful debts.

62.     Under the Agreements, Plaintiff was obligated to repay the money loaned, either in

cash or in stock.

63.    Pursuant to its typical business model, the Agreements provide Power Up with a conversion option that gives Power Up the right to take repayment through the conversion of the debt into newly-issued shares of HPIL's common stock.

64.    Consistent with its practice, Power Up does not exchange the debt on a dollar-for-dollar basis, but at a substantial discount to the market price at the time of conversion – in this case, at a 39-49% variable conversion discount.

65.    The New York Court of Appeals has recently held that for securities of this type, the value conveyed by the fixed conversion discount—such as the ones provided by the Defendants in the Agreements—must be included in the interest calculation for purposes of assessing compliance with usury laws.[14]

66.    By charging through the Agreements more than double the maximum enforceable rate of interest allowed by New York law—25% APR—the Defendants have engaged in the collection of unlawful debts as follows:

a.    Pursuant to the February 11, 2017 Note, the Defendants collected/charged a **97%[15] APR** interest rate based on its loan of $33,000.00;

b.    Pursuant to the August 2017 Note and Amendment, the Defendants collected/charged a **140%[16] APR** interest rate based on its loan of $45,000.00; and

c.    Pursuant to the October 2017 Note and Amendment, the Defendants

---

[14]  *Adar Bays*, *supra*, at 614-15.
[15]  Calculated as 39/61 = .639 or .64 (Conversion discount) x 12/9 = .85 or 85% APR + 12% APR (stated interest) = Total 97% APR interest rate.
[16]  Calculated as 49/51 = .96 (Conversion discount) x 12/9 = 1.28 or 128% APR + 12% APR (stated interest) = Total 140% APR interest rate.

collected/charged a **140%**[17] **APR** interest rate based on its loan of $35,000.00.

67.     The Agreements provided Power Up with an aggregate interest rate of **377% APR** interest rate based on loans totaling just $113,000.00.

68.     As consideration for the loans of $113,000.00 in the aggregate, Plaintiff relinquished cash and stock to Power Up.  On an annualized basis, Plaintiff has paid an interest rate under the Agreements of *no less than a 97% APR interest rate on each of the Agreements to Power Up – more than double the 25% maximum enforceable interest rate permitted under New York's criminal usury statutes.  See* 18 U.S.C. § 1961(6); N.Y. Penal Law § 190.40.

69.     Although the Agreements impose a stated interest rate of 12% per annum, *the 39% to 49% discount at conversion produces an interest rate of approximately 97% to 140% APR – more than at least 3.5 times the maximum enforceable rate* under New York's criminal usury law.

### *Defendants Converted the Notes*
### *(Securities) to Stocks (Also Securities)*

70.     Starting as early as August 2017, Power Up submitted *32 separate conversions* under the Notes, pursuant to which it received *about 2,356,039,568 of newly issued HPIL securities* (hereinafter, the "Related Transactions").

71.     Each of the 32 conversions is a separate securities transaction.

72.     Pursuant to those 32 conversions, Power Up converted a total of $188,340.82 of debt.  The open market value of the 2,356,039,568 newly-issued HPIL securities received by Power Up pursuant to the conversions is approximately $1,064,198.90.  Power Up's discounted

---

[17]   Calculated as 49/51 = .96 (Conversion discount) x 12/9 = 1.28 or 128% APR + 12% APR (stated interest) = Total 140% APR interest rate.

value of the 2,356,039,568 newly-issued HPIL securities received is approximately $224,951.09. Therefore, Power Up's profit from the Notices of Conversion is approximately **$839,247.81**.

73.     As mentioned above, Defendants timed their conversions and sales in an effort to comply with the holding period under Rule 144 and thereby began converting almost immediately after the expiration of the holding period as follows.

    a.     The February 2017 Note:

        i.     On August 28, 2017, a conversion notice was submitted requesting issuance of 2,542,105 shares for the satisfaction of $4,830.00 of debt;

        ii.     On September 22, 2017, a conversion notice was submitted requesting issuance of 3,058,333 shares for the satisfaction of $3,670.00 of debt;

        iii.     On September 26, 2017, a conversion notice was submitted requesting issuance of 3,208,333 shares for the satisfaction of $3,850.00 of debt;

        iv.     On September 27, 2017, a conversion notice was submitted requesting issuance of 3,208,333 shares for the satisfaction of $3,850.00 of debt;

        v.     On September 28, 2017, a conversion notice was submitted requesting issuance of 2,125,000 shares for the satisfaction of $2,550.00 of debt;

        vi.     On October 3, 2017, a conversion notice was submitted requesting issuance of 3,766,667 shares for the satisfaction of $4,520.00 of

debt;

vii.      On October 5, 2017, a conversion notice was submitted requesting issuance of 3,764,045 shares for the satisfaction of $3,350.00 of debt;

viii.     On October 11, 2017, a conversion notice was submitted requesting issuance of 3,758,621 shares for the satisfaction of $3,270.00 of debt;

ix.      On October 12, 2017, a conversion notice was submitted requesting issuance of 4,137,931 shares for the satisfaction of $3,600.00 of debt;

x.      On October 13, 2017, a conversion notice was submitted requesting issuance of 4,142,857 shares for the satisfaction of $4,060.00 of debt;

xi.      On October 13, 2017, another conversion notice was submitted requesting issuance of 4,137,755 shares for the satisfaction of $4,055.00 of debt;

xii.     On October 16, 2017, a conversion notice was submitted requesting issuance of 4,142,857 shares for the satisfaction of $4,060.00 of debt;

xiii.     On October 17, 2017, a conversion notice was submitted requesting issuance of 4,948,980 shares for the satisfaction of $3,835.00 of debt and $1,015.00 of interest; and

xiv.     On October 18, 2017, a conversion notice was submitted requesting

issuance of 1,702,041 shares for the satisfaction of $1,668.00 of debt.

b.    The August 2017 Note:

    i.    On August 27, 2019, a conversion notice was submitted requesting issuance of 202,000,000 shares for the satisfaction of $10,100.00 of debt;

    ii.    On October 5, 2020, a conversion notice was submitted requesting issuance of 95,000,000 shares for the satisfaction of $4,750.00 of debt;

    iii.    On October 7, 2020, a conversion notice was submitted requesting issuance of 106,000,000 shares for the satisfaction of $5,300.00 of debt;

    iv.    On October 8, 2020, a conversion notice was submitted requesting issuance of 95,000,000 shares for the satisfaction of $4,750.00 of debt;

    v.    On October 12, 2020, a conversion notice was submitted requesting issuance of 96,000,000 shares for the satisfaction of $4,800.00 of debt;

    vi.    On October 15, 2020, a conversion notice was submitted requesting issuance of 95,000,000 shares for the satisfaction of $4,750.00 of debt;

vii.      On October 19, 2020, a conversion notice was submitted requesting issuance of 125,000,000 shares for the satisfaction of $6,250.00 of debt;

viii.      On October 22, 2020, a conversion notice was submitted requesting issuance of 128,000,000 shares for the satisfaction of $6,400.00 of debt;

ix.      On October 26, 2020, a conversion notice was submitted requesting issuance of 126,000,000 shares for the satisfaction of $6,300.00 of debt;

x.      On November 3, 2020, a conversion notice was submitted requesting issuance of 126,000,000 shares for the satisfaction of $6,300.00 of debt;

xi.      On November 5, 2020, a conversion notice was submitted requesting issuance of 126,000,000 shares for the satisfaction of $6,300.00 of debt;

xii.      On November 10, 2020, a conversion notice was submitted requesting issuance of 174,000,000 shares for the satisfaction of $8,700.00 of debt;

xiii.      On November 23, 2020, a conversion notice was submitted requesting issuance of 174,000,000 shares for the satisfaction of $8,700.00 of debt;

xiv.    On November 27, 2020, a conversion notice was submitted requesting issuance of 174,000,000 shares for the satisfaction of $8,700.00 of debt;

xv.    On December 4, 2020, a conversion notice was submitted requesting issuance of 30,633,000 shares for the satisfaction of $1,531.65 of debt.

c.    The October 2017 Note:

xvi.    On December 7, 2020, a conversion notice was submitted requesting issuance of 174,000,000 shares for the satisfaction of $8,700.00 of debt;

xvii.    On December 8, 2020, a conversion notice was submitted requesting issuance of 40,000,000 shares for the satisfaction of $2,000.00 of debt; and

xviii.    On April 22, 2021, a conversion notice was submitted requesting issuance of 220,762,710 shares for the satisfaction of $68,436.44 of debt.

74.    Each conversion of debt to stock identified in Paragraph 73 above constitutes an additional securities transaction.

***Defendants Continue to Convert
and Sell Shares of Stock***

75.    Upon information and belief, Defendants continue to purchase new convertible notes, convert shares acquired in convertible debt transactions with counterparty penny stock issuers, and then sell those shares into the market.  Upon information and belief, after waiting out

the Rule 144 holding period, Defendants act in the same manner, and convert and rapidly selling millions of newly-issued shares into the market for substantial profit.

76.     Upon information and belief, Defendants have sold stock that did not meet any of the exceptions from the definition of a "penny stock," as defined by Section 3(a)(51) of the Act and Rule 3a51-1 under the Act.  *See* 15 U.S.C. § 78c(a)(51); 17 C.F.R. § 240.3a51–1.

### The Power Up Managers Control Power Up
### In its Convertible Debt Securities Business

77.     Seth Kramer and Curt Kramer are brothers who work together to provide convertible loans to micro-cap companies.

78.     In 2013, Defendant Curt Kramer and three of his associated firms agreed to pay a $1.4 million civil fine to settle SEC charges that he and his firms "violated the federal securities laws when they purchased millions of shares in a pair of microcap companies and failed to register them before they were re-sold to investors for sizeable profits."[18]  As a result of the SEC's order in connection with the settlement, Curt Kramer is subject to the Bad Actor disqualification provisions of SEC Rule 506.

79.     In 2011, Seth Kramer agreed to pay a $1.2 million civil fine in connection with civil charges by the U.S. Attorney for the Southern District of New York that he and his co-defendants engaged in mortgage fraud.[19]

80.     Upon information and belief, Defendant Curt Kramer is and/or was at all relevant times:

        a.     Chief Executive Officer or a director of Power Up;

---

[18] *Penny Stock Financier Agrees to Pay $1.4 Million to Settle SEC Charges*, SEC.gov, *available at* https://www.sec.gov/news/press-release/2013-249 (last accessed April 13, 2022).

[19] *Manhattan U.S. Attorney Recovers $1.2 Million From Lender In Civil Mortgage Fraud Case*, Justice.gov, *available at* https://www.justice.gov/archive/usao/nys/pressreleases/December11/cambridgesettlementpr.pdf (last accessed April 14, 2022).

     b.     President of Asher;

     c.     A manager, officer, and/or director of Hope; and

     d.     A manager, officer, and/or director of Sixth Street.

81.    Upon information and belief, Defendant Seth Kramer is and/or was at all relevant times:

     a.     President of Power Up (or held himself out to be President of Power Up);

     b.     An officer and/or director of Geneva Roth;

     c.     An officer and/or director of KBM; and

     d.     A manager, officer, and/or director of Vis Vires.

82.    Upon information and belief, Redstart is managed by Gregg Solomon, an employee or independent contractor of Power Up.

83.    At all relevant times, the Power Up Managers have possessed and exercised the ultimate decision-making authority and control over Power Up and the Power Up Enterprise, including the power to decide whether to enter into each of the securities transactions (including the Agreements in this case), which of the Lending Entities should be the one to engage in a transaction, to negotiate and approve the final deal terms, and to monitor the status of the Power Up Enterprise's lending and its acquisition and sales of stock.

84.    The Power Up Managers personally – or through others employed by them or otherwise acting under their direction and control – have negotiated the terms of the convertible notes that Power Up and the Power Up Enterprise have purchased from penny stock issuers (including the Agreements in this case), as well as any amendments thereto.  The Power Up Managers have also signed the contracts by which Power Up and the Power Up Enterprise acquires convertible notes, including the Agreements with HPIL.

85.     At all relevant times, Curt Kramer, as Power Up's sole managing member and dominant shareholder, directly possessed and exercised control over Power Up, including the power to decide whether to enter into agreements – including the Agreements in this case – to negotiate and approve the final deal terms, and to direct its sales of stock.

86.     Upon information and belief, Defendants Curt Kramer and Seth Kramer negotiated and drafted the terms of the convertible notes that Power Up and the Power Up Enterprise have purchased from microcap companies (including HPIL), as well as amendments to the original terms.

87.     The Power Up Managers are the sole persons with power to direct, authorize, and compel Power Up and the Power Up Enterprise to enter into, convert, and subsequently sell securities through convertible notes with issuers, including the Notes with HPIL.

88.     The Power Up Managers are the "controlling persons" within the meaning of § 20(a) of the Act (15 U.S.C. § 78(t)), with the power to cause Power Up to engage in the unlawful conduct described herein.

### The Power Up Managers Conspired to Collect the Unlawful Debts Alleged Herein

89.     Upon information and belief, the Power Up Managers, by and through their agents and/or on behalf of themselves as individuals, agreed and conspired to conduct and participate in the affairs of the Power Up Enterprise by engaging in the collections of the unlawful debts as alleged above.

90.     At all times relevant hereto, each of the Power Up Managers intended to engage in the violations of RICO alleged herein, with actual knowledge of their illegal activities.

91.     Upon information and belief, there is no legitimate business purpose served by the Power Up Managers' creation and maintenance of eight separate Lending Entities in this case,

each of which engages in the same lending activities.  Therefore, the creation and maintenance of eight separate Lending Entities is further evidence of the Power Up Managers' actual knowledge of their illegal activities and of their intent to evade legal responsibility for the same.

92.     Upon information and belief, each of the Power Up Managers agreed and conspired to violate 18 U.S.C. § 1962(c) as alleged herein.

### HPIL was Harmed by the Power Up
### Enterprise's Unlawful Debt Collections

93.     HPIL and its shareholders have been injured in their business and property by reason of the RICO violations alleged herein.

94.     As a result of the unlawful debt collections, Defendants obtained tens of millions of shares of free-trading HPIL common stock to which they were not entitled or capable of lawfully receiving.

95.     The excessive conversions and resulting issuances forced Plaintiff to increase its shares outstanding and massively diluted HPIL's legitimate, disinterested stockholders.

96.     Once Power Up began converting under the Agreements, its immediate and massive selling of large blocks of newly-issued shares of HPIL common stock into the public market caused enormous depression in HPIL's market capitalization and stock price.

97.     As a result of these actions, Plaintiff became unable to privately raise money from other entities, with other unregistered and unregulated lenders becoming the only reasonably available option for short-term financing, leading to more losses.

98.     All of the foregoing harm was foreseeable by Defendants, and was factually and proximately caused by Defendants' collections of unlawful debts, in the manner alleged herein.

99.     Assessment of the total damage caused by the Defendants to Plaintiff is difficult to quantify and will be determined at trial.

## CAUSES OF ACTION

### COUNT I:

*Rescission Pursuant to § 29(b) of the Act for Violation
of § 15(a) of the Act by Power Up for Effecting (Making)
the Agreements as an Unregistered Dealer*
(Against Defendant Power Up)

100.    Plaintiff repeats, reiterates, and re-alleges each and every allegation of Paragraphs

1-99 as though set forth herein.

101.    Section 29(b) of the Act provides in relevant part that:

*Every contract __made in violation__ of any provision of this chapter or of any rule or
regulation thereunder ... shall be void* (1) as regards the rights of any person who,
in violation of any such provision, rule, or regulation, shall have made or …
engaged in the performance of any such contract….

15 U.S.C. § 78cc(b) (emphasis added).

102.    The Agreements were made in violation of Section 15(a) of the Act (15 U.S.C.

§ 78o(a)(1)), which prohibits unregistered dealers from using any means of interstate commerce

to effect transactions in securities.

103.    Power Up is a securities dealer within the meaning of the Act.  *See* 15 U.S.C.

§ 78c(a)(5).

104.    Power Up is engaged in the business of buying and selling securities for its own

account.

105.    Power Up purchased and sold HPIL securities.

106.    Power Up is not registered as a dealer with the SEC or with any other regulatory

body, as required by Section 15(a) of the Act.  15 U.S.C. § 78o(a)(1).

107.    Power Up affected transactions in securities in the HPIL Agreements.

108.    Power Up used the means of interstate commerce to effectuate the Agreements.

109.    As a party to the Agreements, HPIL is in contractual privity with Power Up.

110.   The dealer registration requirement is designed to protect stock issuers (and others) from unscrupulous or unqualified agents acting as dealers.   Accordingly, HPIL, as an issuer, is within the class of persons that the Act was designed to protect.

111.   Because Power Up affected the Agreements in securities as an unregistered dealer and utilized the means of interstate commerce in connection therewith, the Agreements were unlawful *when made.*

## COUNT II:

*Rescission Pursuant to § 29(b) of the Act for*
*Violation of § 15(a) the Act by Unlawfully*
*Transacting in Securities Via Performance of the*
*Agreements as an Unregistered Dealer*
(Against Defendant Power Up)

112.   Plaintiff repeats, reiterates, and re-alleges each and every allegation of Paragraphs 1-111 as though set forth herein.

113.   Section 29(b) of the Act provides in relevant part that:

*Every contract ...* (including any contract for listing a security on an exchange) heretofore or hereafter made, ***the performance of which*** *involves the violation of*, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, *shall be void* (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or  … engaged in the performance of any such contract… *Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, and every contract (including any contract for listing a security on an exchange) heretofore or hereafter made, ... shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made… any such contract…*

15 U.S.C. § 78cc(b) (emphasis added).

114.   The Agreements and Related Transactions were performed in violation of Section 15(a) of the Act (15 U.S.C. § 78o(a)(1)), which prohibits unregistered dealers from using any means of interstate commerce to effect transactions in securities.

115.    Power Up is a securities dealer within the meaning of the Act.  *See* 15 U.S.C. § 78c(a)(5).

116.    Power Up is engaged in the business of buying and selling securities for its own account.

117.    Power Up purchased and sold HPIL securities.

118.    Power Up is not registered as a dealer with the SEC or with any other regulatory body, as required by Section 15(a) of the Act.  15 U.S.C. § 78o(a)(1).

119.    Power Up effected transactions in securities in the Agreements and in the Related Transactions.

120.    Power Up used the means of interstate commerce to perform the Agreements and the Related Transactions.

121.    As a party to the Agreements, HPIL is in contractual privity with Power Up.

122.    The dealer registration requirement is designed to protect stock issuers (and others) from unscrupulous or unqualified agents acting as dealers.  Accordingly, HPIL, as an issuer, is within the class of persons that the Act was designed to protect.

123.    Because Power Up effected the Agreements in securities as an unregistered dealer, and utilized the means of interstate commerce in connection therewith, the Agreements were unlawful *when performed* (via the Related Transactions).

### COUNT III:

*Violation of § 20(a) of the Act by Defendants Curt Kramer and*
*Seth Kramer as Control Persons of Power Up Based on Power Up's*
*Transactions in Securities as an Unregistered Dealer*
(Against Defendants Curt Kramer and Seth Kramer)

124.    Plaintiff repeats, reiterates, and re-alleges each and every allegation of Paragraphs 1-123 as though set forth herein.

125.    Defendants Curt Kramer and Seth Kramer had the power and authority to cause Power Up to engage in the wrongful conduct described in Counts I and II herein.

126.    Defendants Curt Kramer and Seth Kramer did in fact cause Power Up to engage in the wrongful conduct described in Counts I and II herein.

127.    Defendants Curt Kramer and Seth Kramer did not act in good faith.

128.    Defendants Curt Kramer and Seth Kramer directly and/or indirectly induced the acts and conduct that constitute the violations of the federal securities laws alleged in this case.

129.    Therefore, Defendants Curt Kramer and Seth Kramer acted as control persons of the Corporate Defendants within the meaning of § 20(a) of the Act.  15 U.S.C. § 78t.

### COUNT IV:

*Conducting the Affairs of the*
*RICO Enterprise (RICO, § 1962(c))*
(Against All Defendants)

130.    Plaintiff repeats, reiterates, and re-alleges each and every allegation of Paragraphs 1-129 as though set forth herein.

131.    Each of the two Power Up Managers is a RICO culpable "person" within the meaning of 18 U.S.C. § 1961(3):  an individual capable of holding a legal or beneficial interest in property.

132.    The Power Up Enterprise is a RICO association-in-fact "enterprise" within the meaning of 18 U.S.C. § 1962(c).

133.    Each of the Related Transactions constitutes the collection of an unlawful debt.  In the alternative, all the Related Transactions together constitute the collection of an unlawful debt.

134.    The Power Up Managers agreed to and did conduct and participate in the conduct of the Power Up Enterprise's affairs through the collections of unlawful debt from HPIL,

specifically, by collecting and attempting to collect debt unenforceable under New York usury laws, having been incurred by loans by the enterprise that charge, take or receive interest at more than double the maximum enforceable legal rate.

135.    Upon information and belief, pursuant to and in furtherance of their scheme, the Power Up Enterprise is in the business of making loans at usurious interest rates, and thereby committed multiple related acts of unlawful debt collection from a plethora of other needy microcap companies throughout the country.

136.    The Power Up Managers have directly and indirectly conducted and participated in the conduct of the Power Up Enterprise's affairs through the collections of unlawful debts described above, in violation of 18 U.S.C. § 1962(c).

137.    The activities of the Power Up Enterprise, which, *inter alia,* loaned money to corporations nationwide, affected interstate commerce.

138.    As a direct and proximate result of the Defendants' unlawful debt collection and violations of 18 U.S.C. § 1962(c), HPIL has been injured in its business and property because, among other things:  its market capitalization has been significantly decreased, its stock has been unlawfully acquired by the Defendants, and it has suffered further damage and injury to be determined at trial.

### COUNT V:

*Conspiracy to Collect*
*an Unlawful Debt (RICO, § 1962(d))*
(Against Defendants Curt Kramer and Seth Kramer)

139.    Plaintiff repeats, reiterates, and re-alleges each and every allegation of Paragraphs 1-138 as though set forth herein.

140.    Upon information and belief, Defendants Curt Kramer and Seth Kramer intentionally agreed and conspired to, by and through their agents and/or on behalf themselves as individuals, to conduct and participate in the affairs of the enterprise by engaging in the business of collecting unlawful debts from needy microcaps, including HPIL, in the manner alleged in Count IV.

141.    Upon information and belief, Defendants Curt Kramer and Seth Kramer knew that their predicate acts were part of the collection of unlawful debts and nonetheless agreed to the commission of those acts to further the schemes described above.  Such conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c) in the manner alleged in Count IV, in violation of 18 U.S.C. § 1962(d).

142.    As a direct and proximate result of the foregoing conspiracy, the overt acts taken in furtherance of that conspiracy, and the violations of 18 U.S.C. § 1962(d), HPIL has been injured in its business and property because, among other things:  its market capitalization has been significantly decreased; its stock has been unlawfully acquired by the Defendants; and it has suffered further damage and injury to be determined at trial.

### COUNT VI:

*Unjust Enrichment*
(Against All Defendants)

143.    Plaintiff repeats, reiterates, and re-alleges each and every allegation of Paragraphs 1-142 as though set forth herein.

144.    The Defendants have received valuable benefits from HPIL, including, *inter alia*, the stock and profits realized from the sale of the unlawfully issued shares of HPIL common stock.

145.    These benefits are the result of the wrongful conduct alleged in Counts I-V herein.

146.    By engaging in the securities transactions alleged herein, Defendants violated the

federal securities laws.

147.    By charging HPIL an effective interest rate in excess of 25% APR, Defendants violated Section 190.40 of the New York Penal code, a class E felony.

148.    By collecting unlawful debts from HPIL in excess of twice the maximum enforceable rate, and by conspiring to do so, Defendants violated RICO, 18 U.S.C. § 1962(c) and (d).

149.    The Defendants have unjustly retained the benefits of having violated the federal securities laws and RICO at the expense of HPIL and its stockholders.

150.    As a result of the foregoing, the Defendants have been unjustly enriched.

**COUNT VII:**

*Constructive Trust*
(Against All Defendants)

151.    Plaintiff repeats, reiterates, and re-alleges each and every allegation of Paragraphs 1-150 as though set forth herein.

152.    As alleged in Count VI herein, the Defendants have been unjustly enriched by HPIL.

153.    The circumstances are such that it would be fundamentally unjust and inequitable for the Defendants to retain the property conferred on them by HPIL.

154.    HPIL has an interest in the property unjustly retained by the Defendants as a result of the Agreements.

155.    The Defendants have wrongfully acquired and detained HPIL's property obtained via the Agreements.

156.    Allowing the Defendants to retain the property conferred on them by HPIL would inequitably allow the Defendants to profit from their own wrongdoing, and to dispose of said

property for their own purposes including without limitation paying their attorney's fees and costs in connection with this action, and engaging in additional unlawful transactions of the type giving rise to this action.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff HPIL seeks a Verdict and Judgment against the Defendants herein as follows:

1. Count I (Against Power Up)

    a. Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. § 2201, HPIL requests this Court to declare that:

        i. the Agreements are transactions in securities within the meaning set forth in the Act (15 U.S.C. § 78c(a));

        ii. Power Up is operating as an unregistered dealer in securities, in violation of the Act (15 U.S.C. § 78o);

        iii. the Agreements are void and subject to rescission under the Act (15 U.S.C. § 78cc); and

        iv. Power Up is entitled to retain the principal amount of the loans made pursuant to Agreements, already repaid by HPIL.

    b. HPIL requests that this Court enter an Order:

        i. rescinding the Agreements pursuant to the Act (15 U.S.C. § 78cc);

        ii. awarding recessionary damages and such other relief as the Court deems just and equitable to effectuate the voiding and rescission of the Agreements;

        iii. requiring Power Up to return to HPIL all HPIL stock obtained via the

Agreements; and

    iv.    awarding statutory prejudgment interest on any monetary award and on the value of any stock obtained via the Agreements.

2. Count II (Against Power Up)

    a.    Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. § 2201, HPIL requests this Court to declare that:

    i.    the Agreements are transactions in securities within the meaning set forth in the Act (15 U.S.C. § 78c(a));

    ii.    Power Up is operating as an unregistered dealer in securities, in violation of the Act (15 U.S.C. § 78o);

    iii.    the Agreements are void and subject to rescission under the Act (15 U.S.C. § 78cc); and

    iv.    Power Up is entitled to retain the principal amount of the loans made pursuant to Agreements, already repaid by HPIL.

    b.    HPIL requests that this Court enter an Order:

    i.    rescinding the Agreements pursuant to the Act (15 U.S.C. § 78cc);

    ii.    awarding recessionary damages and such other relief as the Court deems just and equitable to effectuate the voiding and rescission of the Agreements;

    iii.    requiring Power Up to return to HPIL all HPIL stock obtained via the Agreements; and

    iv.    awarding statutory prejudgment interest on any monetary award and on the value of any stock obtained via the Agreements.

3. Count III (Against Curt Kramer and Seth Kramer)

    a. Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. § 2201, HPIL requests this Court to declare that:

        i. Curt Kramer and Seth Kramer had the power and authority to cause Power Up to engage in the wrongful conduct described in Counts I and II herein;

        ii. Curt Kramer and Seth Kramer did in fact cause Power Up to engage in the wrongful conduct described in Counts I and II herein; and

        iii. Curt Kramer and Seth Kramer each acted as a control person of Power Up within the meaning of Section 20(a) of the Act (15 U.S.C. § 78t(a)).

    b. HPIL requests that the Court enter an Order, pursuant to Section 20(a) of the Act (15 U.S.C. § 78t(a)), holding Curt Kramer and Seth Kramer liable with and to the same extent that Power Up is liable to HPIL under Counts I and II herein.

4. Count IV (Against All Defendants)

    a. HPIL requests that this Court enter a Judgment against all the Defendants as follows:

        i. awarding HPIL compensatory, direct, and consequential damages;

        ii. awarding HPIL treble damages as a remedy for the economic injuries caused by the Defendants' collection of unlawful debt;

        iii. awarding HPIL its attorneys' fees and costs associated with this litigation;

        iv. entering an award of monetary damages jointly and severally against the Defendants; and

        v. awarding such further and additional legal and equitable relief that this Court deems just, proper, and in the interest of justice.

5.  Count V (Against Defendants Curt Kramer and Seth Kramer)

    a.  HPIL requests that this Court enter a Judgment against Defendants Curt Kramer and Seth Kramer as follows:

        i.   awarding HPIL compensatory, direct, and consequential damages;

        ii.  awarding HPIL treble damages as a remedy for the economic injuries caused by the Defendants' collection of unlawful debt;

        iii. awarding HPIL its attorneys' fees and costs associated with this litigation;

        iv.  entering an award of monetary damages jointly and severally against Defendants Curt Kramer and Seth Kramer; and

        v.   awarding such further and additional legal and equitable relief that this Court deems just, proper, and in the interest of justice.

6.  Count VI (Against All Defendants)

    a.  Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. § 2201, HPIL request that this Court declare that:

        i.   Defendants have voluntarily accepted and retained the property conferred by HPIL on the Defendants through and as a result of the violations of the Act and RICO as alleged herein, and

        ii.  the circumstances are such that it would be inequitable for the Defendants to retain the property conferred on them by HPIL without first paying the value thereof to HPIL, to prevent the Defendants from being unjustly enriched.

    b.  HPIL requests that this Court enter an Order requiring Defendants to return to HPIL the value of the property they have unjustly retained in the amount of

$1,064,198.90, less the value conferred upon HPIL.

7. Count VII (Against All Defendants)

    a. Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. § 2201, HPIL requests this Court to declare that:

        i. Defendants have voluntarily accepted and retained the property conferred by HPIL on the Defendants through and as a result of violations of the Act and RICO, as alleged herein;

        ii. the circumstances are such that it would be inequitable for Defendants to retain the property conferred on them by HPIL without first paying the value thereof to HPIL, to prevent Defendants from being unjustly enriched; and

        iii. HPIL has an interest in the property unjustly retained by the Defendants as a result of the Agreements.

    b. HPIL requests that this Court enter an Order imposing a constructive trust *pendente lite* and permanently on HPIL property in possession of the Defendants as a result of the property conferred on them by HPIL.

8. As to each of the foregoing Counts I-VII, to the extent permitted by applicable law, and not otherwise requested, HPIL requests that this Court enter an Order:

    a. awarding HPIL compensatory, direct, and consequential damages;

    b. awarding HPIL its attorneys' fees and costs associated with this litigation;

    c. entering an award of monetary damages jointly and severally against the Defendants; and

    d. awarding such further and additional legal and equitable relief that the Court deems just, proper, and in the interest of justice.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues properly so tried.


DATED: April 22, 2022                    Respectfully submitted,

                                         **THE BASILE LAW FIRM P.C.**

                                         By:   */s/ Eric Benzenberg*
                                         Eric Benzenberg, Esq.
                                         390 North Broadway, Suite 140
                                         Jericho, NY 11753
                                         Tel.:   (516) 455-1500
                                         Fax:    (631) 498-0748
                                         Email: eric@thebasilelawfirm.com

                                         *Attorneys for Plaintiff HPIL Holding*